38.     Michael Min, an analyst at Korea Investment and Securities, has been quoted as saying that the investigation may be focused on a period over the last several years when manufacturers of TFT-LCD Products were charging comparable prices. (<http://www.washingtonpost.com/wp-dyn/content/article/2006/12/12/AR2006121200260.html>).

39.     There are also other indications that Defendants have engaged in collusive activity. A "Crystal Cycle" is an industry term that refers to shortages in the supply-and-demand cycle for LCD displays. A recent article in *Infoworld* (available at <http://www.infoworld.com/article/06/06/13/79145_25OPreality_1.html>) cited Chris Connery, an industry analyst at DisplaySearch, as follows: "[a]ccording to Connery, the talk in the industry is that the manufacturers are looking to create an artificial Crystal Cycle. At a recent conference in Taiwan, a leading producer of LCD glass stated publicaly that the industry should collectively look at a cutting back on production from 100 percent to at least 85 percent. Otherwise, if supply outpaces demand, manufacturers will be forced to cut prices. ... Will the mother-glass manufacturers actually create this artificial shortage? 'The chatter is growing louder each day,' Connery says." A subsequent *Infoworld* article (<http://www.infoworld.com/article/06/06/12/79223_HNphilipscutslcd_1.html>) noted that the unnamed Taiwanese executive came from AU Optronics.

40.     Similarly, Samsung's presentation described above noted that "it was possible to secure a reasonable amount of profit while following the industry leaders" during the Class Period.

41.     Defendants, through their officers, directors and employees, effectuated the aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

   a.   participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of TFT-LCD Products in the United States, including the District of Columbia;

   b.   agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of TFT-LCD Products sold in the United States, including the District of Columbia;

   c.   issuing price announcements and quotations in accordance with the agreements reached; and

   d.   selling TFT-LCD Products to various customers in the United States, including the District of Columbia at non-competitive prices.

### FRAUDULENT, ACTIVE, AND SELF-CONCEALMENT

42.     Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pretextural and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

16

43. As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS-ACTION ALLEGATIONS

44. Plaintiff brings this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of herself and the following class members:

### Injunctive-Relief Class

All persons and business entities in all 50 states that indirectly purchased Thin Film Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid Crystal Display manufactured, sold, or distributed by Defendants, for end use and not for resale, from at least January 1, 1998 through at least December 31, 2005.

Excluded from the Injunctive-Relief Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives, successors, or assigns, judicial officers who may hear the case or related persons, and jurors or related persons.

Plaintiff also brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class members:

### Money-Damages Class

All people and business entities in the District of Columbia that indirectly purchased Thin Film Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid Crystal Display manufactured, sold, or distributed by Defendants, for end use and not for resale, from at least January 1, 1998 through at least December 31, 2005.

Excluded from the Money-Damages Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives, successors, or assigns, judicial officers who may hear the case or related persons, and jurors or related persons.

17

45.     Plaintiff has met the requirements of Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

46.     Plaintiff does not know the exact size of the classes, since this information is in Defendants' exclusive control. But based on the nature of the trade and commerce involved, Plaintiff believes that each class numbers at least in the hundreds and that the members of each class are geographically dispersed throughout the District of Columbia (Money-Damages Class), or alternatively, throughout the U.S. including in the District of Columbia (Injunctive-Relief Class). Therefore, joinder of the members of each class would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

47.     Plaintiff's claims within the respective classes are typical of other class members' claims because all class members were injured through the uniform misconduct described and paid supra-competitive prices for products containing TFT-LCD without being informed that they were paying illegal and improper prices. Accordingly, by proving her own claims, Plaintiff will presumptively prove the respective class members' claims.

48.     The following common questions of law or fact, among others, exist as to the members of the Class:

      a.  Whether Defendants conspired to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

      b.  Whether Defendants conspired to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

      c.  The existence and duration of Defendants' horizontal agreements to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

  d. The existence and duration of Defendants' horizontal agreements to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

  e. Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

  f. Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia;

  g. Whether Defendants' conspiracy was implemented;

  h. Whether Defendants took steps to conceal their conspiracy from Plaintiff and the class members;

  i. Whether Defendants' conduct caused injury in fact to the business or property of Plaintiff and the class members, and if so, the appropriate class-wide measure of damages;

  j. Whether the agents, officers or employees of Defendants and their co-conspirators participated in telephone calls, meetings, and other communications in furtherance of their conspiracy; and

  k. Whether the purpose and effect of the acts and omissions alleged was to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia, and to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or the District of Columbia.

49. Plaintiff can and will fairly and adequately represent and protect the respective class members' interests and have no interests that conflict with or are antagonistic to the class members' interests. Plaintiff's attorneys are experienced and competent in complex class action and consumer-antitrust litigation.

50. Class certification of the respective, alternative classes is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

  a. Common questions of law and fact overwhelmingly predominate over any individual questions that may arise among or within the respective, alternative classes and, consequently, enormous economies to the court and parties exist in litigating the common issues on a class-wide basis or, alternatively, bases, instead of on a repetitive individual basis or, alternatively, bases;

  b. Each individual class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

  c. Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members; and

  d. Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims, whether considered in a national class or, alternatively, in a District of Columbia class, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class or, alternatively, classes.

51. Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecution of separate actions would create a risk of adjudication with respect to individual class members, whether within or among the respective classes, which may, as a practical matter, dispose of other class members' interests who aren't parties to the adjudication or which may substantially impair or impede their ability to protect their interests. Separate actions prosecuted by individual class members would also create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

52.     Class certification, whether as a national class or a District of Columbia class, is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the respective class' members.

53.     Plaintiff's claims within and among the respective classes are typical of the associated class members' claims because Defendants injured Plaintiff and the respective class members in the same manner (*i.e.*, Plaintiff and the respective class members were forced to pay supra-competitive prices for products containing TFT-LCD Product).

## TRADE AND COMMERCE

54.     Throughout the Class Period, Defendants and their co-conspirators engaged in the business of marketing and selling TFT-LCD Products throughout the United States.

55.     As Defendant LG Philips states on its website, "the thin-film transistor liquid crystal display ("TFT-LCD") is a cutting-edge display, which screens picture information by adjusting the amount of light permitted." (<http://www.lgphilips-lcd.com/homeContain/jsp/eng/tech/tech210_j_e.jsp>). LG Philips further states that "TFT is a circuit formed with semiconductor films on a this glass substrate to control liquid crystals.... This circuit plays a vital role in controlling each pixel, the basic unit of a picture image. The color filter displays a color image by coating the pixel (red, green and blue) on a glass substrate." *Id.*

56.     At the portion of its website entitled "How TFT-LCD Works", Defendant LG Philips explains:

> A pixel, the smallest unit to indicate a picture image, is formed by three sub-pixels consisting of red, green and blue. The number of pixels arranged in a display determines the resolution of the TFT-LCD. TFT is composed of a data line (image signal transfer) and gate line (TFT on/off signal transfer). TFT existing in each sub-pixel controls the voltage difference between the TFT glass electrode and the color filter glass

electrode in order to adjust the molecular array of liquid crystals. Such a change in the molecule direction of liquid crystals alters the amount of light penetrating the liquid crystal layer. Consequently, the TFT-LCD display shows picture image information.
(http://www.lgphilips-lcd.com/homeContain/jsp/eng/tech/tech210_01_j_e.jsp>)

57.  The company describes some of the applications for TFT-LCD technology as follows:

> TFT-LCD technology has created a wide range of computer and consumer products that would not have been possible with cathoderay tubes (CRT). The flat and thin attributes of LCDs make them ideal for mobile or portable applications. In addition, LCDs can operate at low voltage levels and dissipate with low heat exposure. Initially, LCDs were incorporated into notebook computers, similar in size and resolution to 12-14 inch CRT monitors. Through innovation, TFT-LCD engineers were able to develop displays providing much higher resolution than CRTs, in addition to producing them in larger sizes.
>
> Today, TFT-LCDs are challenging CRT-based desktop computer monitors. As a result, a wider range of mobile computing applications are now available. Engineers have found ways to reduce weight, thickness, and the frame width of notebook computer displays. New TFT process technologies make it possible to deliver more pixels per inch and allow even portable computers to display more information than the latest CRT monitor. Such technology became available just as DVDs became popular, so consumers can now get DVD players in very thin and light packages. Currently, a similar transformation is occurring with next-generation cell phones and wireless networks.

(http://www.lgphilips-lcd.com/homeContain/jsp/eng/tech/tech210_02_j_e.jsp>).

58.  The market for TFT-LCD Products is huge. An October 10, 2006 article stated that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70 percent over 2005, with flat-panel sales – most of those using LCD technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007, according to market research company Display Search." (<http://www.theagecom.au/ news/home-theatre/they-are-building-it-but-will-lcd-sales-come/2006/10/09/ 1160246068541.html#>).

22

59.     The market for the manufacture and sale of TFT-LCD Products is also conductive to the type of collusive activity alleged here. That market is oligopolistic in nature. According to date from iSuppli, in 2005, LG Philips had 21.4% of the large TFT-LCD panel global market share, Samsung had 20.9%, AU Optronics had 14.5%, Chi Mei had 11.8%, and Chunghwa had 7.3%, while the remaining suppliers controlled 24.1%.
(<http://www.eetimes.com/showArticle.jhtml?articleID=177101936>). Samsung took over the leading position in the industry in 2006.
(<http://biz.yahoo.com/rb/061211/lgphilips_investigation.html?.v=2>).

60.     Some of these companies are known antitrust violators. Samsung, for example, was fined $300 million by the United States Department of Justice ("DOJ") in October of 2005 for participating in a conspiracy to fix prices for Dynamic Random Access Memory. It is also under investigation by the DOJ (along with some of the other Defendants) for fixing prices of Static Random Access Memory.

61.     The industry is also marked by a web of cross-licensing agreements that facilitate collusion. AU Optronics, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006. Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

62.     The market for the manufacture and sale of TFT-LCD Products is subject to high manufacturing and technological barriers to entry, some of which are described in Samsung's own November 3, 2005 "Market Perspective & Strategy" presentation available at its website.
(<http:www.samsung.com/AboutSAMSUNG/
ELECTRONICSGLOBAL/InvestorRelations/IREventsPresentations/AnalystDay/index.htm>).
Efficient fabrication plants are large and costly. TFT-LCD Products are also subject to

23

technological advances, so that firms within the industry must undertake significant research and development expenses.

63. The TFT-LCD Products industry has also been subject to significant consolidation during the Class Period, as reflected in AU Optronics' recent acquisition of Quanta Display, the creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac Optoelectronics, or Fujitsu Limited's transfer of its LCD business to Sharp in 2005.

64. Defendants sell their TFT-LCD Products through various channels including to manufacturers of electronic products and devices, and to resellers of TFT-LCD products. These electronic products and devices and TFT-LCD Products are then sold, directly or indirectly, to consumers and are not altered during the course of sale.

## COUNT I
### (Applicable to the Injunctive-Relief Class)
### VIOLATION OF THE CLAYTON ACT

65. Plaintiff repeats and re-alleges paragraphs 1 through 64.

66. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of TFT-LCD Products in the U.S., in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

67. In formulating and carrying out their illegal agreement, understanding, and conspiracy, Defendants and their co-conspirators did the following things, among others:

    a. Fixed, raised, maintained, and stabilized the prices of TFT-LCD Products;

    b. Allocated TFT-LCD Products markets among themselves;

    c. Rigged bids for the award and performance of certain TFT-LCD Products contracts; and

   d. Allocated among themselves and collusively reduce the production of TFT-LCD Products.

68. Defendants' combination and conspiracy had the following effects, among others:

   a. Price competition in the sale of TFT-LCD Products was restrained, suppressed, and/or eliminated in the U.S. including the District of Columbia;

   b. Prices for TFT-LCD Products sold by Defendants and their co-conspirators were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S. including the District of Columbia; and

   c. Those who purchased TFT-LCD Products directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition.

69. Plaintiff has been injured and will continue to be injured in her business and property by paying more for TFT-LCD Products purchased indirectly from Defendants and their co-conspirators than he would have paid and will pay in the absence of Defendants' conspiracy, including paying more for personal computers and other TFT-LCD Products or products containing TFT-LCD Product components by the manufacturers of those products.

70. As a proximate cause of Defendants' conspiracy, Plaintiff is entitled to an injunction against Defendants preventing and restraining Defendants' violations.

**COUNT II**
**(Applicable to the Money-Damages Class)**
**VIOLATION OF D.C. CODE §28-4501 *et seq.***

71. Plaintiff repeats and re-alleges paragraphs 1 – 70.

72. During the Class Period, Defendants engaged in a contract, combination, or conspiracy in restraint of trade or commerce within the District of Columbia. In particular, Defendants conspired to fix TFT-LCD Product prices and allocate TFT-LCD Product customers and markets. Defendants' conspiracy lessened full and free competition in TFT-LCD Products'

importation and sales into the District of Columbia and controlled their costs, which violated D.C. Code §28-4501 *et seq.*

73. Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize TFT-LCD Product prices; (b) allocate TFT-LCD Product customers and markets; and (c) caused Plaintiff and the other District of Columbia class members to pay higher prices for TFT-LCD Product that they indirectly purchased from Defendants.

74. In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

    a. Met to discuss TFT-LCD Product customers and markets;

    b. Agreed to charge prices at certain levels and to increase or maintain prices for TFT-LCD Product sold in the District of Columbia;

    c. Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

    d. Allocated TFT-LCD Product markets and customers consistent with their illegal agreement.

75. Defendants' conspiracy had the following effects:

    a. TFT-LCD Product price competition was restrained, suppressed, and eliminated throughout the U.S., including in the District of Columbia;

    b. TFT-LCD Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in the District of Columbia;

    c. Plaintiff and the other District of Columbia class members that indirectly purchased TFT-LCD Product were deprived of free and open market competition and were injured; and

    d. Plaintiff and the other District of Columbia class members paid more than they otherwise would have for TFT-LCD Product that they purchased indirectly.

76.     Defendants' conspiracy has substantially affected and impacted trade and commerce within the District of Columbia.

77.     During the Class Period, District of Columbia consumers indirectly purchased millions of dollars of Defendants' TFT-LCD Product in the District of Columbia from Defendants. By reason of Defendants' violations of the D.C. Code §28-4501, Plaintiff and the District of Columbia class members paid significantly more for products containing Defendants' TFT-LCD Product than they would have paid absent Defendants' illegal combination and conspiracy, and, as a result, Plaintiff and the District of Columbia class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

### COUNT III
### (Applicable to the Money-Damages Class)
### UNJUST ENRICHMENT

78.     Plaintiff repeats and re-alleges paragraphs 1 through 77.

79.     As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Plaintiff and the District of Columbia class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Plaintiff and the class members.

80.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and District of Columbia class members suffered injury and seek an order directing Defendants to return to them the amount each of them improperly paid to Defendants, plus interest.

### JURY DEMAND

81.     Plaintiff demands trial by jury on all triable issues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in the respective class members' favor and against Defendants, as follows:

A. That this Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify either or both classes;

B. With respect to the Injunctive-Relief Class, that this Court rule that Defendants' conspiracy violated the Sherman Act and that injunctive relief under the Clayton Act is appropriate;

C. With respect to the Money-Damages Class, that this Court rule that Defendants' conspiracy violated District of Columbia law and that compensatory damages, including treble damages, are appropriate;

D. With respect to the Money-Damages Class, that this Court determine that Defendants were unjustly enriched;

E. That this Court permanently enjoin Defendants from conspiring to fix TFT-LCD Product prices and allocating TFT-LCD Product markets or other injunctive relief as this Court deems appropriate;

F. That this Court award Plaintiff post-judgment interest, her costs, and reasonable attorneys' fees; and

G. That this Court order any other relief as it deems just and proper.

Dated: March 6, 2007                    Respectfully submitted,

                                        By: _____
                                        Donna F. Solen #465098
                                        Gary E. Mason #418063
                                        **THE MASON LAW FIRM, LLP**
                                        1225 19th Street, NW
                                        Suite 500
                                        Washington, DC 20036
                                        Telephone: 202-429-2290
                                        Facsimile: 202-429-2294
                                        Email: gmason@masonlawdc.com
                                        Email: dsolen@masonlawdc.com

Daniel R. Karon, Esq.
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113
Telephone:   (216) 622-1851
Facsimile:   (216) 622-1852
E-mail:       karon@gsk-law.com

Krishna B. Narine, Esq.
**LAW OFFICES OF KRISHNA B. NARINE**
7893 Montgomery Avenue, Suite 300
Elkins Park, PA 19027
Telephone:   (215) 782-3240
Facsimile:   (215) 782-3241
E-mail:       knarine@kbnlaw.com

Gordon Ball, Esq.
**BALL & SCOTT**
Suite 750, Bank of America Center
550 Main Street
Knoxville, TN 37902
Telephone:   (865) 525-7028
Facsimile:   (865) 525-4679
E-mail:       gball@ballandscott.com